Filed 12/29/22  DeBevoise v. Robinson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ANNE E. DEBEVOISE et al., <br><br> Plaintiffs, Cross-defendants and Respondents, <br><br> v. <br><br> RANDALL ROBINSON, Individually and as Trustee, etc. et al., <br><br> Defendants, Cross-complainant and Appellants. | D078207, D078679 <br><br><br> (Super. Ct. No. 37-2016-00017584-CU-OR-CTL) |

CONSOLIDATED APPEALS from a judgment and orders of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.

Blackmar, Principe & Schmelter and Timothy D. Principe for Plaintiffs, Cross-defendants and Respondents.

DeLano & DeLano, Everett L. DeLano III and M. Dare DeLano for Defendants, Cross-complainants and Appellants.

After a bench trial, the trial court resolved a dispute between two neighbors by creating an equitable easement and granting other relief in favor of plaintiffs Anne DeBevoise-Abel and Nicolas Abel (collectively the DeBevoises). Defendants Randall Robinson (Randy) and Pamela Robinson (Pam), individually, and as trustees of the Robinson Trust dated May 13, 2013 (collectively the Robinsons) appeal the judgment, including an earlier order sustaining a demurrer to a portion of their cross-complaint, and a postjudgment order awarding attorney's fees and costs to the DeBevoises. The Robinsons contend the trial court prejudicially erred when it awarded the DeBevoises an equitable easement over their property. Even assuming the propriety of the easement, the Robinsons claim the trial court abused its discretion and committed reversible error by: (1) expanding the easement's scope of use; (2) extending it in perpetuity; and (3) refusing to award damages. The Robinsons next assert that the trial court erred: (1) in creating and awarding the DeBevoises a quasi-irrevocable license for their drainage pipe; (2) granting a permanent injunction; (3) awarding attorney's fees to the DeBevoises; and (4) by sustaining the DeBevoises' demurrer to the Robinsons' financial elder abuse causes of action without leave to amend.

As we shall explain, we reject the Robinsons' arguments and affirm the orders and judgment.

2

## FACTUAL AND PROCEDURAL BACKGROUND[1]

The parties live in Pacifica Unit 2, a planned community with "stepped and height restricted" lots to allow for "views over and beyond adjoining residences." Their properties were subject to a Declaration of Restrictions recorded in 1960 (the Original Declaration) by the builders and then-owners of all lots in the community. In 2013, the community adopted an Amended and Restated Declaration of Restrictions (Amended Declaration). The Amended Declaration provides that its "primary purpose . . . is to preserve the view corridors of each home to the maximum practical extent" and created a three-person Architectural Committee. "Any modifications, improvements, or changes to improvements to a Residence that adversely affect, impact or impair the view corridors of any surrounding Residences are subject to review and approval by the Architectural Committee before any work on said modifications or changes can commence." (Boldface omitted.) Failure to comply with the Amended Declaration "decisions, or resolutions shall be grounds for an action to recover sums due, for damages, or for injunctive relief."

The parties are the second generation to own and live in their homes, their parents having bought the homes when they were new. Anne and Randy both lived in their respective homes as children, and eventually took

---

[1] This section provides a general background regarding events leading to this lawsuit. Additional facts related to the specific claims at issue in this appeal will be described in that particular section of the discussion. We summarize the relevant facts in the light most favorable to the DeBevoises as the prevailing party, giving them the benefit of all reasonable inferences. (*Richardson v. Franc* (2015) 233 Cal.App.4th 744, 748 (*Richardson*).)

ownership from their parents.[2]  Anne believed that the property line between her home and the Robinsons' home ran midway on the slope between the two properties stating, "That's how all the properties in the neighborhood were divided up."  However, the property line between these two homes is different.  It runs at a slight angle so that the western corner of the pad *above* the slope is owned by the Robinsons, whose home is on the pad below.

During trial, the parties referred to that portion of land owned by the Robinsons above the top of the slope as "the Point."  The DeBevoises used the Point for, among other things, a pathway that allowed them to access the upper portion of their property which was otherwise inaccessible due to the steep incline.

In 1998, Anne obtained a letter (the Letter) from 89-year-old Rex Robinson, Randy's father, while he was hospitalized.  In the Letter, Rex indicated that he agreed to a "lot-line adjustment and a view easement."[3]

---

[2]    In 2021, the Robinsons transferred their home to their son, with the action continuing in the names of the original parties.  (Code Civ. Proc., § 368.5.)

[3]    The Letter is addressed to Randy.  It is dated, signed by Rex and a nurse.  The nurse handwrote that Rex is "lucid today."  The Letter provides: "In the event I am unable to do so, please complete the following lot-line adjustment and easement, described below.  [¶]  In May I agreed to a lot-line adjustment to grant to Anne DeBevoise roughly 500 square feet at the North-west corner of my lot.  Over the last 35 years, Anne and her family have assumed responsibility and paid essentially all costs for improving and maintaining that area, which is one of my motivations for giving the area to Anne.  While the land is a gift, Anne is paying all the fees for processing the lot-line adjustment.  [¶]  To ensure that Anne's view over my property remains unobstructed in the future I am granting her an easement above my property at and above the level of the floor of her home.  For this I have asked for and received one dollar ($1.00), which is adequate consideration for this easement.  Anne is paying the fees for processing this easement.  [¶]  Since several trees and bushes have gotten too big and begun to block Anne's view,

Thereafter, the DeBevoises installed an underground drainage pipe across a portion of the Point that exited into a drainage culvert and city easement along the westerly and southwesterly 10 feet of the Robinsons' property. The drainage pipe replaced an older inadequate drainage pipe that had been abandoned.

In 2012, the Robinsons' proposal to put a fence along the property line created a dispute between the parties. The DeBevoises, however, continued to use the Point as they always had, including to maintain the plants growing there and for access to the upper portion of their property.

In 2016, after another disagreement, the Robinsons installed a portion of a fence, plastic chairs, large pots with plants, and wood stakes along a portion of the Point, blocking the DeBevoises' view and blocking their access along the path they historically used to access the upper portion of their property. In early May 2016, the DeBevoises' lawyer wrote a demand letter to Randy that attached the Letter and claimed that the DeBevoise family had rights to the Point. Later that month, the DeBevoises filed this action.

While the lawsuit was pending, the DeBevoises made a formal complaint to the community's Architectural Committee. The Architectural Committee determined that the items placed on the Point by the Robinsons impeded the DeBevoises' view. The Architectural Committee informed the Robinsons that the items violated the Amended Declaration and requested their removal. The Robinsons refused to remove the items.

Before trial, the court observed that the DeBevoises were not basing any of their claims on the Letter, and the DeBevoises' counsel informed the court and the Robinsons that the DeBevoises were not relying on the Letter

___

I have instructed my gardener to trim them in order to restore Anne's view, and to keep them trimmed. [¶] Thank you for ensuring the above instructions are carried out within the next year."

in any way for their claims. During a four-day bench trial, the court heard testimony from the parties, some neighbors, and several experts. Anne testified that she never completed the lot-line adjustment mentioned in the Letter and was not relying on the Letter to claim any right to the Robinsons' property.

The trial court inspected the parties' two properties with counsel and then issued an oral statement of decision. It awarded the DeBevoises an equitable easement across the Robinsons' property for access to the upper portion of the DeBevoises' property and a revocable license for the drainage pipe. It found in favor of the DeBevoises on their claim for violation of the view restriction provisions of the Amended Declaration and issued a permanent injunction to prevent future violations. In posttrial proceedings, the trial court found the DeBevoises to be the prevailing parties and awarded them a portion of their attorney's fees and costs.

## DISCUSSION

### I. General Legal Principles and the Standard of Review

A trial court judgment is presumed to be correct (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133) and the appellant has the burden to overcome that presumption and show reversible error. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.) A reviewing court will overturn a trial court's equitable decision only if it finds an abuse of the court's discretion that resulted in a miscarriage of justice. (*Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1008 (*Tashakori*) ["When reviewing a trial court's exercise of its equity powers to fashion an equitable easement, we will overturn the decision only if we find that the court abused its discretion."]; cf. *Wm. R. Clarke Corp. v. Safeco Ins. Co. of America* (2000) 78 Cal.App.4th 355, 359 ["It follows that the trial court's decision [regarding the

right to a setoff] was one subject to an exercise of its equitable powers, and that the only issue before us on this appeal is whether that discretion was so abused that it resulted in a manifest miscarriage of justice."].)

" '[O]ne of the essential attributes of abuse of discretion is that it must clearly appear to effect injustice. [Citations.] Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 (*Denham*).) "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.)

## II. Equitable Easement for Access

### A. *Additional Background*

The trial judge found that viewing photographs of the parties' properties could be "very misleading" depending on the age and angle of the photograph. Immediately before issuing his oral statement of decision, the judge visited the parties' properties, walking the lots and taking photographs. The court ultimately declined to find a prescriptive easement, but concluded that the DeBevoises were entitled to an equitable easement over the Point for ingress and egress to allow them to maintain the upper portion of their property.[4] It found the DeBevoises did not act willfully or negligently, and would suffer "irreparable injury" if they did not have some access. It further

---

[4] " 'To establish the elements of a prescriptive easement, the claimant must prove use of the property, for the statutory period of five years, which use has been (1) open and notorious; (2) continuous and uninterrupted; (3) hostile to the true owner; and (4) under claim of right.' " (*Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1032.)

7

determined that the DeBevoises' hardship "would be greatly disproportionate to the hardship caused to" the Robinsons.

## B. *Legal Principles*

"In appropriate cases in which the requirements for traditional easements are not present, California courts have exercised their equity powers to fashion protective interests in land belonging to another, sometimes referring to such an interest as an 'equitable easement.' " (*Tashakori, supra,* 196 Cal.App.4th at p. 1008.) Three factors must be present to justify the creation of an equitable easement: (1) the easement seeker must use or improve property innocently, not willfully or negligently; (2) the party opposing the easement must not suffer irreparable harm by the creation of the easement; and (3) the hardship of denying the easement must be greatly disproportionate to the hardship of allowing it. (*Id.* at p. 1009; *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 759 (*Hirshfield*).) "To be willful the [easement seeker] must not only know that he is [traveling] on the plaintiff's land, but act without a good faith belief that he has a right to do so. [Citation.] Thus, if [the property owner] in the present case induced [the easement seeker] . . . to believe that he had a right to act, [the easement seeker's] claim of good faith is supported. On the other hand, continuation of [travel] after objection by [the property owner] suggests a lack of good faith." (*Brown Derby Hollywood Corp. v. Hatton* (1964) 61 Cal.2d 855, 859 (*Brown Derby*).) An easement seeker can act intentionally and "yet be innocent if he acted in good faith. Moreover, [the property owner] could have induced [the easement seeker's] good faith belief without expressly consenting." (*Id.* at pp. 859–860.)

We review a court's decision whether to recognize an equitable easement under the abuse of discretion standard. (*Nellie Gail Ranch Owners*

8

*Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1005–1006.) This standard "includes a substantial evidence component: 'We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its discretion. If there is no evidence to support the court's findings, then an abuse of discretion has occurred.'" (*Id.* at p. 1006.) "Where the trial court . . . has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable. [Citation.] The trier of fact is not required to believe even uncontradicted testimony." (*Hinrichs v. Melton* (2017) 11 Cal.App.5th 516, 524–525 (*Hinrichs*).) If substantial evidence supports the trial court's expressed and implied factual findings, "our analysis ends; we may not substitute our deductions for those of the trial court." (*Nellie Gail*, at p. 1006.)

## C. *Analysis*

### 1. *A civil trespass is not a necessary predicate to recognizing an equitable easement.*

The Robinsons assert the trial court erred in creating an equitable easement because a finding that a trespass occurred is a necessary element for this remedy, and the court never made this finding. They claim the trial court could not have found that a trespass occurred and instead found to the contrary because the DeBevoises' verified factual allegations admitted they had permission to use the Point, which precludes the imposition of an equitable easement. Because the DeBevoises failed to plead an essential element to create an equitable easement, the Robinsons argue that the trial court's ruling is erroneous as a matter of law and must be reversed. The DeBevoises disagree that a "trespass" is a required element to create an equitable easement. We agree with the DeBevoises.

9

A civil trespass " 'is an unlawful interference with possession of property.' " (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 261.)[5] "The elements of trespass are: (1) the plaintiff's ownership or control of the property; (2) the defendant's intentional, reckless, or negligent entry onto the property; (3) lack of permission for the entry or acts in excess of permission; (4) harm; and (5) the defendant's conduct was a substantial factor in causing the harm." (*Ralphs Grocery,* at p. 262.) The Robinsons cited no authority, and we have found none, that proving a civil trespass occurred is a required element before a court can create an equitable easement. Rather, as the DeBevoises note, equitable easement cases use the terms "trespass" or "encroachment" alternatively when discussing whether the equitable easement seeker's conduct was innocent. (See e.g., *Romero v. Shih* (2022) 78 Cal.App.5th 326, 355 [trespass must be innocent, not willful or negligent]; *Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 19 (*Shoen I*) [same]; *Tashakori, supra*, 196 Cal.App.4th at p. 1009 [encroachment must be innocent, not willful or negligent]; *Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 265 (*Linthicum*) [same]; *Hirshfield, supra*, 91 Cal.App.4th at p. 759 [utilizing terms trespass and encroachment to describe conduct of easement seeker].) What is uniform in these cases is the required element that the conduct of the person seeking the equitable easement be innocent, not willful or negligent.

---

[5] The Penal Code criminalizes several types of trespass. (See Pen. Code, §§ 601, 602.) There is no provision that generally makes it a crime to enter private property without permission. Instead, for private property not otherwise covered by the statute, a person generally commits a criminal trespass only after the owner, owner's agent, person in lawful possession, or a peace officer asks the person to "leave" the property and the person refuses or fails to do so. (See Pen. Code, § 602, subd. (o).)

By creating an equitable easement, the trial court impliedly found that the DeBevoises acted innocently, not willfully or negligently.[6] The Robinsons did not challenge this implied finding and substantial evidence supports it. Anne testified that as a child she would go onto the Point every day to cut through the culvert on her way to school or to play there. Her father landscaped the Point and the area around it. She left for college in 1969 and visited the DeBevoise property between 1969 and 1985. She and other family members used the Point during this time.

In 1998, Anne returned to live in the DeBevoise home with her parents. She and her parents continued to use the Point almost every day to read the newspaper or maintain the area. Anne's parents deeded her the property in 1991 and then moved. After acquiring the property, Anne continued to use the Point every day unless it was raining or she was sick. She and her husband watered and maintained the plants on the Point and used the Point to access the upper portion of their property to clean the culvert, trim shrubs, and plant. In 1998, Anne obtained the Letter from Rex indicating that he was "gift[ing]" the Point to Anne and "granting her an easement above [his] property at and above the level of the floor of [Anne's] home" for the payment of "one dollar," which he "received." Thereafter, the DeBevoises installed an underground drainage pipe across a portion of the Point that exited into the culvert. Anne explained that she needed the drainpipe because her backyard had flooded with several inches of water and claimed the pipe had to go under the Point because no alternative existed.

Anne testified that the Robinsons never gave permission to use the Point and she never requested permission. Randy similarly testified that he

---

[6] The trial court expressly found that the DeBevoises did not act "adverse or hostile" to the Robinsons.

could not recall ever giving Anne or any member of the DeBevoise family formal permission to use any portion of his property. He admitted that had he seen any of the DeBevoise family on the Point he would not have told them to leave, explaining, "Unless they're doing something untoward, I don't believe that it's neighborly to force them to leave."

In 2012, after a dispute regarding the Robinsons' removal of some fencing, the Robinsons told the DeBevoises that they could no longer use the Point. Despite this, Anne continued to use the Point as always to maintain the plants and to access the upper portion of the DeBevoises' property.

Anne believed she always had the right to use the Point, even before she received the Letter signed by Rex. After Rex signed the Letter, Anne believed that Rex had gifted her the Point on May 3, 1998. However, none of the DeBevoises' causes of action claim any rights under the Letter, and Anne testified that she was not relying on the Letter to claim a right to any portion of the Robinsons' property.[7]

Thus, despite the Robinsons telling the DeBevoises in 2012 that they could no longer use the Point, the DeBevoises continued to do so. Finally, in 2016, the parties had additional discussions about the DeBevoises' use of the Point. Pam saw Anne trimming a shrub and screamed at her, " 'What are you doing? That's our property.' " That same day, Randy pounded metal stakes into the ground along the property line and attached fence pieces to the stakes to create a barrier along the property line. At this point, the Robinsons' statements and actions clearly indicated that the DeBevoises could no longer use the Point. The DeBevoises filed this lawsuit shortly thereafter.

---

[7] The trial court ruled that the DeBevoises could use the Letter for "consent purposes."

The Robinsons' focus on whether the DeBevoises had permission to use the Point is based on their mistaken belief that the DeBevoises were required to show they committed a civil trespass, which they claim the DeBevoises cannot do because the DeBevoises' use was permissive. Instead, however, the seminal question is whether the DeBevoises' use of the Point was innocent. If the DeBevoises had permission to use the Point, or if they acted based on a good faith belief that they had permission, their actions were innocent. (*Brown Derby*, *supra*, 61 Cal.2d at p. 859 [easement seeker's good faith claim supported by property owner inducing the easement seeker to believe he had a right to act].) Here, Rex allowed the DeBevoise family to use the Point during his lifetime. After Rex's death, the DeBevoises continued to use the Point until shortly before they filed this action.

Viewing the evidence in favor of the DeBevoises, as we must, it supports the trial court's implied conclusion that the DeBevoises innocently used the Point for 51 years (1961 to 2012) believing they could do so. From 2012 to 2016, the DeBevoises continued to use the Point, erroneously believing the Letter gave them this right. Although the evidence could be subject to a different inferences, we must draw all reasonable inferences to uphold the judgment and will not disturb the judgment if there is evidence supporting it. (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.) Here, the DeBevoises' innocent use of the Point supported the creation of an equitable easement.

### 2. *Substantial evidence supports the trial court's balancing of the respective hardships.*

Assuming we reject their initial arguments, the Robinsons assert the trial court erred as a matter of law and exceeded its jurisdiction by imposing an equitable easement for a "footpath of convenience" on the Robinsons'

13

property because the DeBevoises could have accessed the upper portion of their sloped lot without trespassing across the Robinsons' "somewhat-less-steep property." In making this argument, the Robinsons rely on *Shoen I*, *supra*, 237 Cal.App.4th 16, where the appellate court reversed the granting of an equitable easement after concluding "as a matter of law that the hardship on [the easement seeker] in this case was not greatly disproportionate to the hardship on [the property owner]." (*Id.* at pp. 18–19, 22.) They contend the trial court erred in relying on *Tashakori*, *supra*, 196 Cal.App.4th 1003, and that *Shoen I* is controlling because the DeBevoises "failed from the outset to meet the essential and onerous requirements for imposing an equitable easement" because the footpath easement merely provided a "more convenient" path of travel for the DeBevoises to access a portion of their property.

Accordingly, the Robinsons have shifted their argument to the remaining two elements necessary to justify the creation of an equitable easement—namely, that the party opposing the easement must not suffer irreparable harm by the creation of the easement; and the hardship of denying the easement must be greatly disproportionate to the hardship of allowing it. (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1009.) Here, the trial court found that the DeBevoises required access to the upper portion of their property to trim the shrubbery and would suffer "irreparable injury" to not have some access. It concluded that the hardship to the DeBevoises "would be greatly disproportionate to the hardship caused to" the Robinsons finding that the easement would be "sufficiently to the north as to not interfere with any proposed construction" by the Robinsons. Accordingly, it granted the DeBevoises an equitable easement by means of a path approximately three feet wide across the Point for the sole purpose of allowing the DeBevoises

14

ingress and egress to the upper portion of their property. The easement does not allow the DeBevoises quiet enjoyment of the Robinsons' property.

As a preliminary matter, the Robinsons do not challenge the sufficiency of the evidence supporting the trial court's factual findings that the DeBevoises required access to the upper portion of their property to trim the shrubbery, that they would suffer "irreparable injury" to not have some access, and that the easement would not interfere with the Robinsons' proposed construction. We " ' "must *presume* that the record contains evidence to support every finding of fact" ' " with the appellant having the burden of identifying and establishing deficiencies in the evidence. (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) An appellant attempting to demonstrate that insufficient evidence supports an order must marshal all the evidence relevant to the claim and affirmatively show insufficiency of the evidence under the substantial evidence standard. The Robinsons' failure to proceed in this manner forfeited any claim regarding the sufficiency of the evidence supporting the trial court's factual findings. (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 415–416 (*Chicago Title*).) We therefore accept these findings as established in analyzing whether the trial court abused its discretion in balancing the hardship to the parties.

On the second and third elements, the trial court impliedly found that the Robinsons would not suffer irreparable harm by the creation of the easement and that the hardship of denying the easement would be greatly disproportionate to the hardship of allowing it. (*Tashakori, supra*, 196 Cal.App.4th at p. 1009.) The Robinsons do not challenge the sufficiency of the evidence supporting these implied findings and forfeited any claim regarding the sufficiency of the evidence supporting them. (*Chicago Title*,

15

*supra*, 188 Cal.App.4th at pp. 415–416.) In any event, the Robinsons have not explained, with citations to the record, how they would suffer irreparable harm by the creation of the easement or how the relative hardships balanced in their favor. (*Tashakori*, at p. 1009.)

The Robinsons' argument that the trial court erred in relying on *Tashakori*, *supra*, 196 Cal.App.4th 1003, instead of *Shoen I*, *supra*, 237 Cal.App.4th 16, is misplaced. As the DeBevoises correctly note, the legal standards in these two cases are consistent—the *Shoen I* court quoted *Tashakori* when stating the three prerequisites for an equitable easement. (*Shoen I*, at p. 19.) In *Tashakori*, the property owner did not challenge the trial court's conclusion that balancing the hardships favored the easement seeker, whereas in *Shoen I*, the appellate court found, as a matter of law, that the hardship on the easement seeker was not greatly disproportionate to the hardship on the property owner. (*Tashakori*, at p. 1010; *Shoen I*, at p. 22.) The Robinsons' implied argument, that we should find in their favor as a matter of law, ignores that every equitable easement case presents an inherently fact specific inquiry that turns on the unique circumstances of each case.

In *Shoen I*, two hillside neighbors shared a flat "patch" of land that was readily accessible only from the defendant's/easement seeker's property but owned by the plaintiff. (*Shoen I*, *supra*, 237 Cal.App.4th. at p. 18.) The easement seeker put some furniture on the "patch," believing she owned this property. (*Ibid.*) The plaintiff sued to reclaim the patch as her property. (*Ibid.*) The trial court held the defendant was entitled to an equitable easement allowing her to maintain her furniture and use this portion of plaintiff's property. (*Id.* at pp. 18–19.) The appellate court reversed, finding the defendant failed to satisfy her burden on the third element (balancing of

16

hardships) of the equitable easement test. (*Id.* at pp. 18, 22.) The court reasoned that the $275 cost to remove the easement seeker's furniture from plaintiff's property "was not greatly disproportionate to the hardship on" the plaintiff, which included the complete loss of use of this portion of her property for a 15-year period. (*Id.* at pp. 19, 22.)

In contrast here, the trial court did not create an equitable easement giving the DeBevoises the unfettered right to use the Point for any purpose. Rather, it allowed the DeBevoises a three foot wide path across the Point to access the upper portion of their property, specifically finding "a necessity for the [DeBevoises] to access the upper part of their property to trim the shrubbery." The trial court rendered its ruling after noting the misleading nature of photographs and performing a site inspection, which it believed would "be significant in the court's ultimate decision."

The Robinsons disagree with the trial court's finding of necessity, claiming the court merely "provide[d] a more convenient path of travel for [the DeBevoises] to access a portion of their property." However, a finding of necessity is not required to create an equitable easement. (*Tashakori, supra,* 196 Cal.App.4th at p. 1009.)[8] In any event, substantial evidence supported the trial court's conclusion that, practically speaking, the DeBevoises required a pathway across the Robinsons' property to access the upper portion of their property. Nicolas testified that he used the Point to access the top of their property because "there really wasn't any way to get up to the top. The back of the property is almost a cliff and goes from being low down by the Point to being, I don't know, at least 30 feet high at the upper end.

---

[8] A strict necessity requirement exists only for an easement by necessity, which the DeBevoises did not allege. (*Murphy v. Burch* (2009) 46 Cal.4th 157, 163.)

17

The only way to get up there is to -- is to go across the Point." He supported this testimony by referring to a topographical map depicting the elevation levels of the property. A long time neighbor also stated that historically she and the DeBevoise family used the path along the Point to get up to the back of the DeBevoises' property because: "[I]t's not possible from the back part of the house to go directly up the slope. It's much too steep for that."

After viewing the property, the trial court impliedly agreed with this testimony. We have no power on appeal to reweigh the evidence. (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.) Unlike *Shoen I*, *supra*, 237 Cal.App.4th 16, the facts here do not compel a finding in the Robinsons' favor as a matter of law.

### 3. *The trial court did not abuse its discretion in defining the scope and location of the equitable easement.*

Assuming the trial court appropriately created an equitable easement, the Robinsons' next claim the court abused its discretion and committed reversible error by (a) expanding the easement's scope of use, (b) extending it in perpetuity, and (c) refusing to award damages. We examine each contention in turn.

The Robinsons complain that the trial court impermissibly expanded the scope of the equitable easement by giving the DeBevoises, their agents and successors in interest the right to "use, repair, improve, and maintain the easement area for safe ingress and egress." They claim this portion of the judgment is inconsistent with the court's statement that the DeBevoises have "no reason . . . to be out there except to go in and out" and "[t]hey're not going to be up there digging in the ground and that sort of thing," "[t]hey have the right to walk on it."

It is a "well recognized rule that an express or implied grant of an easement carries with it certain secondary easements essential to its enjoyment, such as the right to make repairs, renewals, and replacements. Such incidental easements may be exercised so long as the owner thereof uses reasonable care and does not increase the burden on or go beyond the boundaries of the servient tenement, or make any material changes therein. In such cases it has been recognized that an insubstantial change in the location of the means of diversion will not destroy the easement." (*Ward v. Monrovia* (1940) 16 Cal.2d 815, 821–822.)

In 2013, the California Legislature made the duty to maintain an easement statutory by amending Civil Code section 845 which provides, in relevant part, that the owner of any easement "shall maintain it in repair." (*Ibid.*)  Based on this statutory duty, it was arguably unnecessary for the trial court to expressly state in the judgment that the DeBevoises had the right to "use, repair, improve, and maintain the easement area for safe ingress and egress."  Nonetheless, even assuming the language was superfluous, the Robinsons have not explained, with citation to authority, how this language impermissibly expanded the scope of use of the equitable easement.  Rather, given the highly contentious nature of this litigation, the trial court acted reasonably in expressly stating the DeBevoises' rights to avoid future conflict. For example, historically steppingstones existed on the incline.  The DeBevoises used the steppingstones to access the upper portion of their property.  However, the steppingstones had been removed, making it dangerous to attempt to walk up the slope.  The trial court mentioned the need for improvements, such as steps, in its oral statement of decision.

We do not consider the court's statement that the DeBevoises should not be "digging in the ground" as being inconsistent with repairing or

19

maintaining the easement. The evidence adduced at trial showed that the DeBevoises historically planted and maintained the plants on the Point. Based on this evidence, the trial court's statement made it clear that the equitable easement did not include this historic use.

Citing *Hirshfield*, *supra*, 91 Cal.App.4th 749 and *Christensen v. Tucker* (1952) 114 Cal.App.2d 554, the Robinsons next argue that the trial court abused its discretion by allowing the equitable easement to run with the land instead of terminating should either party sell their property. The Robinsons cited no authority that allowing an equitable easement to run with the land is unusual especially where, as here, any successor in interest to the DeBevoises' land will also require the easement for access to the upper portion of the lot. *Hirshfield* and *Christensen* do not support the Robinsons' argument because they both involved encroaching structures that could be removed. (*Christensen*, at p. 555; *Hirshfield*, at p. 756.)

The Robinsons assert the trial court erred by refusing to award them damages and claim that they had no duty to put on evidence of damages, because the DeBevoises had not alleged a cognizable cause of action for an equitable easement. They also assert they could not offer evidence of damages because they did not know the scope of the easement, and the trial court abused its discretion by refusing their request to offer evidence of damages once the parameters and location of the easement had been determined.

Review of the Robinsons' operative cross-complaint shows that they allegedly suffered damages to protect their property, requested an order to remove cloud upon title to their property, as well as prevent any further

20

misuse of their property by the DeBevoises.[9]  The Robinsons could have presented evidence on these alleged damages but did not.  Instead, during closing argument, the Robinsons' counsel stated, "We have not put on a case for damages.  That aspect of it, we're just asking for nominal damages."[10] Counsel later indicated that the nominal damages pertained to the DeBevoises act of spraying a weed killer on the Robinsons' property.  In its oral statement of decision, the trial court impliedly denied the Robinsons' request for nominal damages or damages based on the easement, stating, "[T]here's no indication that that little [strip] would diminish the value of the [Robinsons'] property."

"The doctrine of equitable easements allows compensation to the servient property owner," over whose property the easement is granted. (*Hinrichs, supra,* 11 Cal.App.5th at p. 524; *Linthicum, supra,* 175 Cal.App.4th at p. 268 [when the court creates an equitable easement, the

---

9    We reject the Robinsons' assertion that they did not present any evidence of damages in part because "no cognizable cause of action for equitable easement had been alleged."  The DeBevoises' operative complaint alleged a cause of action for an equitable easement and their trial brief addressed this claim.  Thus, the Robinsons had abundant notice that the trial court would be considering an equitable easement.

10    This statement undercuts the Robinsons' claims in this appeal that they could not have offered proof of damages because the easement area was not specified, and that the easement area was valuable to them.  Also, their claim that an award of nominal damages would have given them prevailing party status ignores that the DeBevoises recovered nonmonetary relief including an equitable easement, a revocable license, and injunctive relief. Where, as here, a party recovers relief other than monetary relief, "the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not."  (Code Civ. Proc. § 1032, subd. (a)(4).)  It is highly unlikely that the court's decision regarding the prevailing party would have changed even if it had awarded the Robinsons nominal damages.

21

servient property owner "is ordinarily entitled to damages"].)  Nonetheless, "[t]he trial court cannot award damages in the abstract" and the Robinsons had the burden of proof on damages.  (*Linthicum*, at p. 268.)  Here, the trial court expressly found that the easement granting the DeBevoises a path to cross the Robinsons' property did not diminish the value of the property.  The Robinsons presented no argument or authority challenging this finding.  In reality, the Robinsons are asking us "to reweigh the evidence and substitute our discretion for that of the trial court. . . .  [T]hese are not legitimate functions of the Court of Appeal."  (*In re Marriage of Bower* (2002) 96 Cal.App.4th 893, 897.)

Finally, the Robinsons assert that the scope and location of the equitable easement were contrary to the trial court's own findings justifying the easement.  They claim the trial court located the easement along the property line in its oral statement of decision but later moved the easement to take more of their yard.  They argue that the relocated easement contravenes the court's own balancing-of-hardship findings, and thus constitutes reversible error.  The DeBevoises respond that the Robinsons are misleading the court because the trial court did not state that the easement would be along the property line.  We agree with the DeBevoises.

In its oral statement of decision, the trial court described the easement as follows:

> "And so it would go more or less straight along where
> there's dirt now.  And there's -- it would go up a rise, it
> would not go down to the -- I'm going to call it the south,
> but would pretty much go straight west, but that would
> allow for access, and may require putting in steps or
> something, but it would do that."

The court did not describe the easement as following the property line between the parties' lots.  Later, the court discussed the location of the

easement with both counsel while consulting photographs. During this discussion, the court did not state that the easement would follow the property line. At the first hearing addressing the proposed judgments, after Robinsons' counsel asserted the easement would run along the property line, the court stated, "I don't think I did, because that would have been simple." At a subsequent hearing, the court reviewed the easement locations proposed by both parties, stating that after "consider[ing] all of the equities and the various claims" the easement location put forward by DeBevoises, not along the property line "was what I was pointing to and what I visualized." The judgment included a drawing of the easement similar to the drawing proposed by the DeBevoises' expert.

### III. Revokable License for the Drainage Pipe

#### A. *Additional Facts*

In late 1998, the DeBevoises had a drainage pipe installed under the Point that exited into a culvert. Anne explained that the drainage pipe had to go under the Point because no alternative existed. The drainage pipe replaced an older inadequate drainage pipe installed in the same area in the 1980's that had been abandoned. Anne told Rex that she would be installing the drainage pipe but never asked for his permission to do so.

Both the old and new drainage pipe emptied into a drainage culvert and city easement along the westerly and southwesterly 10 feet of the Robinsons' property. The city easement overlaps the Point. The DeBevoises' drainage pipe also overlaps a portion of the city easement. Pedro Miguel Parames, a civil and environmental engineer specializing in hydrology and hydraulics, and erosion and sediment control, testified that no alternative configuration existed for the DeBevoises' drainage pipe to instead drain to the street and also meet the City of San Diego design manual requirements.

23

The DeBevoises' operative complaint sought a judicial determination that they had an irrevocable license to use the easement area for the drainage pipe or, alternatively, a prescriptive easement. The trial court concluded that the DeBevoises were not entitled to a prescriptive or equitable easement. It also determined that "there was consent and there was a license," but the DeBevoises had not expended enough money on the drainage pipe to be entitled to an irrevocable license. Noting that it might be "putting a square peg in a round hole here in terms of traditional license," the trial court found that a revokable license to install the 1998 drainage pipe existed, "but only insofar as it did not interfere with the legal and productive use of" the Robinsons' property. The court stated that if the Robinsons obtained plans and permits to construct a cabana, they would have the right to revoke the license. The court reserved jurisdiction to resolve any disputes concerning revocation of the license.

## B.  *Analysis*

The Robinsons' claim that the trial court prejudicially erred in creating a quasi-irrevocable license for the DeBevoises' drainage pipe and by imposing conditions to revoke the license. While admittedly unusual, we believe the court's decision reasonably accommodates the parties' respective interests and represents an appropriate use of its broad equitable powers.

" 'When a landowner allows someone else to use her land, the owner is granting a license. [Citation.] A license may be created by express permission or by acquiescence (that is, by "tacitly permit[ing] another to repeatedly do acts upon the land" "with full knowledge of the facts" and without objecting).' [Citation.] Unlike covenants that run with the land, such as easements, a license is a personal right and confers no interest in land: '[I]t merely makes lawful an act that otherwise would constitute a

24

trespass.' " (*Gamerberg v. 3000 E. 11th St., LLC* (2020) 44 Cal.App.5th 424, 429 (*Gamerberg*).) Because a license is permissive, " ' "[a] licensor generally can revoke a license at any time without excuse or without consideration to the licensee." ' " (*Ibid.*) "An otherwise revocable license becomes irrevocable when the licensee, acting in reasonable reliance either on the licensor's representations or on the terms of the license, makes substantial expenditures of money or labor in the execution of the license, and the license will continue 'for so long a time as the nature of it calls for.' " (*Richardson*, *supra*, 233 Cal.App.4th at pp. 757–758.)

Trial courts have great latitude to " ' "mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication." ' " (*Richardson*, *supra*, 233 Cal.App.4th at p. 757.) "Discretion is abused only when the trial court's decision 'exceeded the bounds of reason.' " (*Ibid.*) We "review any subsidiary factual findings for substantial evidence and any subsidiary legal questions de novo." (*Shoen v. Zacarias* (2019) 33 Cal.App.5th 1112, 1118 (*Shoen II*).)

Here, the DeBevoises installed the new underground drainage pipe across a portion of the Point that exited into a culvert. Anne explained that the drainage pipe had to go under the Point because no alternative existed and required the pipe to address flooding in her backyard. Parames examined the DeBevoises' drainage system. He concluded that the drainage pipe adequately drained stormwater from the DeBevoises' property. He explained that the DeBevoises could not construct an alternative drainage system that met current City of San Diego design manual requirements. Although the Robinsons presented contrary evidence, the trial court necessarily agreed with the DeBevoises' expert. Where, as here, " 'evidence

on an issue conflicts, the decisionmaker is "permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others." ' " (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 349.) On this record, the trial court did not exceed the bounds of reason by finding a revocable license.

The Robinsons next contend that the trial court erred in granting a "quasi-irrevocable" license, relief that was not alleged and is not recognized by law. They also assert the trial court erred in holding a licensor's purported reasons for granting a revocable license are binding on successors in interest. We reject these contentions.

"A fundamental maxim of jurisprudence is that equity must follow the law. [Citation.] Equity is bound by rules of law; it is not above the law and cannot controvert the law. [Citation.] Equity penetrates beyond the form to the substance of a controversy, but is nonetheless bound by the prescriptions and requirements of the law. [Citation.] While equitable relief is flexible and expanding, its power cannot be intruded in matters that are plain and fully covered by positive statute. A court of equity will not lend its aid to accomplish by indirect action what the law or its clearly defined policy forbids to be done directly." (*Barrett v. Stanislaus County Employees Retirement Assn.* (1987) 189 Cal.App.3d 1593, 1608; *Robin v. Crowell* (2020) 55 Cal.App.5th 727, 753 [equity cannot controvert "matters that are plain and fully covered by positive statute"].)

Although the Robinsons assert the trial court provided relief which the law denies, they cite no authority supporting their contention that the equitable relief granted by the trial court *controverted* the law. Trial courts have wide discretion to " ' "mold and adjust their decrees as to award substantial justice" ' " based on the unique circumstances presented for

26

adjudication. (*Richardson, supra*, 233 Cal.App.4th at p. 757.) Here, the DeBevoise family installed a drainage pipe through the Point in the 1980's. In 1998, Anne installed the new drainage pipe. The Robinsons presented no evidence that Rex objected to the installation of the new drainage pipe, or that the Robinsons ever objected to the drainage pipe and asked for its removal. Rather, it appears the Robinsons first sought removal of the drainage pipe in their cross-complaint. Courts hearing equitable claims have "the authority to fashion an equitable remedy appropriate to the circumstances of [the] case." (*Salazar v. Matejcek* (2016) 245 Cal.App.4th 634, 648 (*Salazar*).) This includes " ' "creat[ing] new remedies to deal with novel factual situations." ' " (*Ibid.*)

Parames testified that the drainage pipe functioned as intended. More importantly, the Robinsons presented no evidence that the drainage pipe or the water flowing from it harmed their real or personal property. Thus, the trial court allowed the drainage pipe to remain as a license, but gave the Robinsons the right to revoke the license should the drainage pipe at some point in the future "interfere with the legal and productive use of" the Robinsons' property. Under the circumstances, the trial court did not abuse its discretion by imposing conditions for removal of the drainage pipe. (*Nationwide Biweekly Administration, Inc. v. Superior Court of Alameda County* (2020) 9 Cal.5th 279, 300 [courts have the equitable power to do "right and justice" without being bound by "rigid dogmas"].) On the record before it, the trial court acted within its broad equitable powers in devising a remedy that allowed the drainage pipe to remain until such time that it interfered with the Robinsons' reasonable use of their property.[11]

---

[11] The Robinsons contend that the Letter formed the basis for the DeBevoises' claim to an irrevocable license for the drainage pipe. As such,

27

## IV. Permanent Injunction Against Obstructions

### A. *Additional Facts*

In 2016, the Robinsons placed some decorative fence pieces to mark the boundary between the parties' lots after finding Anne gardening in their yard. The DeBevoises' eighth cause of action alleged violation of the Amended Declaration based on the Robinsons' acts of, among other things, placing this temporary fencing, Adirondack chairs, large blue pots, and wood stakes in such a manner as to impact and impair their view.

The trial court found that the fence pieces and high backed chairs violated the Amended Declaration. By January 2019, the fence, chairs and pots had been removed but the wood stakes remained. The court stated that the stakes should be lowered to two feet in height. In September 2020, the court entered its judgment, which included ruling in favor of the DeBevoises on their claim for violation of the Amended Declaration. The court found that the fence, pots, chairs, and tall stakes on the Robinsons' property that were located along their northerly property line at the time of trial violated the Amended Declaration, and it enjoined the Robinsons "from placing any items at the top of the slope near or along [their] northerly property line as follows: [(1)] Before placing or maintaining any item at the top of the slope near or along [the Robinsons'] northerly property line, [the Robinsons] shall request and receive approval from the Architectural Committee if there is a valid

---

they assert that the license granted by the trial court contravened its pre-trial order of judicial estoppel preventing the DeBevoises from arguing that the Letter "grants any right, title or interest in the property at issue to DeBevoise." A license, however, "is a personal right and confers no interest in land." (*Gamerberg*, *supra*, 44 Cal.App.5th at p. 429.) Accordingly, the DeBevoises did not need to rely on the Letter to establish the existence of a license and the trial court did not err to the extent it considered the Letter as evidence of Rex's consent to install the new drainage pipe.

Architectural Committee; [and] [(2)] If there is no valid Architectural Committee, [the Robinsons] shall not place or maintain anything at the top of the slope near or along [their] northerly property line that exceeds two feet in height. This Judgment is not intended to deprive [the Robinsons] and their successors of the right to construct a pool . . . , and the Court reserves jurisdiction to consider fencing for a pool."

**B.**   *Analysis*

" 'A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate. A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate.' " (*Benasra v. Mitchell* (2002) 96 Cal.App.4th 96, 110.) " 'The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.' " (*Salazar*, *supra*, 245 Cal.App.4th at p. 647.)

The Robinsons assert the trial court erroneously issued the permanent injunction as "punishment" because no evidence existed showing a wrongful act was likely to recur. The Robinsons cited no authority to support this argument or their claim that the trial court abused its discretion by issuing an injunction. Rather, during the litigation the Architectural Committee informed the Robinsons that the items they placed along the property line constituted a violation of the Amended Declaration and requested that the items be removed within 45 days. The Robinsons' removed a palm tree but refused to remove the other items until the court issued its statement of decision over a year later. In fact, after the DeBevoises filed this action, the Robinsons placed additional items along the property line.

29

The Amended Declaration requires owners to comply with its provisions and provides that any failure to comply "shall be grounds for an action . . . for injunctive relief." Given the history of this litigation, ample evidence existed from which the trial court could reasonably infer that the Robinsons might very well violate the Amended Declaration in the future by placing items on the Point in such a manner as to impact and impair the DeBevoises' view. Accordingly, we conclude that the trial court did not abuse its discretion in issuing the injunction.

## V. Attorney's Fees and Costs

### A. *Additional Background*

The Original Declaration bound all owners and their successors in interest. It provided that the covenants ran with the land and would bind "all parties and all persons claiming under them for a period of thirty years from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of ten years *unless an instrument, signed by a majority of the then owners of the lots or parcels, has been recorded, agreeing to change said covenants in whole or in part, or to terminate said covenants.*" (Italics added.)

The Amended Declaration provides that it "amends, restates and replaces" the Original Declaration, the "undersigned Owners constitute a simple majority of the Owners of the Residences subject to this Declaration and hereby consent to the recordation of this Declaration," and "the following easements, restrictions and covenants, which are enforceable equitable servitudes as described in California CIVIL CODE Section 1354 and . . . [are] binding on all parties having any right, title or interest in the Community, their heirs, successors and assigns, and shall inure to the benefit of each Owner thereof." The Amended Declaration provides that any owner has the

30

right to enforce "all restrictions, covenants, reservations, liens and charges now or hereafter imposed by this Declaration" and any owner who prevails in litigation filed to enforce any of the covenants or restrictions is entitled to costs and reasonable attorney's fees. The " 'prevailing party' " is defined as "the party in whose favor a final judgment is entered."

The DeBevoises filed a postjudgment motion seeking $433,814 in attorney's fees and $33,837.73 for their costs, claiming that the litigation involved enforcement of the Amended Declaration. The Robinsons opposed the motion, argued that the attorney's fees clause in the Amended Declaration was unenforceable because (1) the parties did not agree to it, and (2) it does not qualify as a covenant running with the land or an equitable servitude.

At the hearing on the motion, the trial court stated that the motion was "one of the worst fee applications that I've ever seen." The court took the matter under submission and concluded that the Robinsons were judicially and equitably estopped from challenging the Amended Declaration. Even assuming the Robinsons could overcome the bar of judicial and equitable estoppel, it rejected the Robinsons' argument that the Amended Declaration was not a binding equitable servitude. Because the DeBevoises "made it impossible for the court to fully analyze the time spent," the court reduced the attorney's fees sought by a percentage. It awarded the DeBevoises $74,930.80 in attorney's fees and total costs of $18,339.56.

## B. *Analysis*

The Robinsons' claim that the attorney's fees clause in the Amended Declaration is unenforceable as a matter of law under the unique facts of this case. They first maintain that the attorney's fees clause is not enforceable as a contract because the parties did not agree to it. As secondary arguments,

31

they contend that the attorney's fees clause is not enforceable as a covenant running with the land or as an equitable servitude because the community is not a common interest development subject to the Davis-Stirling Common Interest Development Act (David-Stirling Act; Civ. Code, § 4000 et seq.), and the attorney's fees clause does not otherwise meet the requirements for enforcement as an equitable servitude.[12]

"Attorney fees are not recoverable as costs unless a statute or contract expressly authorizes them." (*California Wholesale Material Supply, Inc. v. Norm Wilson & Sons, Inc.* (2002) 96 Cal.App.4th 598, 604.) Where a contract provides for an award of attorney's fees, Civil Code section 1717 allows their recovery by whichever contracting party prevails. (*Cargill, Inc. v. Souza* (2011) 201 Cal.App.4th 962, 966.) We review the legal basis for an attorney's fees award de novo as a question of law. (*Ibid.*)

Here, there is no statutory basis for an attorney's fees award. Nonetheless, as we shall explain, the Amended Declaration is an equitable servitude that is enforceable as a contract containing an attorney's fees clause.

"Planned communities have developed to regulate the relationship between neighbors so all may enjoy the reasonable use of their property. Mutual restrictions on the use of property that are binding upon, and

---

[12] Covenants are said to run with the land when they bind not only the person who enters into them, but also later owners and assigns who did not personally agree to them. (*Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 353 (*Citizens*).) The doctrine of equitable servitudes arose where courts of equity enforced covenants that, for one reason or another, did not run with the land in law. (*Ibid.*) "Commentators have argued that covenants that run with the land and equitable servitudes should be, or possibly have been, merged into a single doctrine." (*Id.* at p. 354.)

32

enforceable by, all units in a development are becoming ever more common and desirable." (*Citizens, supra,* 12 Cal.4th at pp. 348–349.) In *Citizens*, the California Supreme Court rejected a claim that recorded declarations (covenants, conditions and restrictions or CC&R's) were unenforceable when not mentioned in a deed. (*Id.* at p. 348.) Where, as here, "a declaration establishing a common plan for the ownership of property in a subdivision and containing restrictions upon the use of the property as part of the common plan, is recorded before the execution of the contract of sale, describes the property it is to govern, and states that it is to bind all purchasers and their successors, subsequent purchasers who have constructive notice of the recorded declaration are deemed to intend and agree to be bound by, and to accept the benefits of, the common plan; the restrictions, therefore, are not unenforceable merely because they are not *additionally* cited in a deed or other document at the time of the sale." (*Id.* at p. 349.)

Rex purchased his property subject to the Original Declaration. Rex subsequently quitclaimed the property into a family trust and Randy later took title to the property as the successor trustee upon Rex's death. Randy subsequently transferred the property to himself and Pam, who then transferred the property to a trust. The Original Declaration bound all owners and their successors in interest as covenants that ran with the land until a recorded instrument, signed by a majority of the owners, agreed to change or terminate the covenants. The recorded Amended Declaration, signed by a majority of the owners, replaced the Original Declaration and expressly provides that "the following easements, restrictions and covenants" are enforceable equitable servitudes "binding on all parties having any right, title or interest in the Community, their heirs, successors and assigns."

To escape this clear language that they are subject to the Amended Declaration, the Robinsons seek to separate the attorney's fees clause from the remainder of the Amended Declaration, arguing that the attorney's fees clause is unenforceable because it is not a "land use restriction." They also contend that they and the DeBevoises voted against the Amended Declaration; thus, there is no contract or agreement between the parties authorizing the recovery of attorney's fees.

It is true that the Robinsons took title to their property with knowledge of the Original and not the Amended Declaration, and it is only the Amended Declaration that contained the attorney's fee provision. That does not change the fact that the Amended Declaration is an equitable servitude, binding on the parties whether they voted for or against it. (See, e.g., *Villa Milano Homeowners Assn. v. IL Davorge* (2000) 84 Cal.App.4th 819, 825 [listing supporting authority].) That is because the Robinsons took title knowing that the Original Declaration could be changed by a majority vote, and that any resulting changes would constitute equitable servitudes. As a result, the attorney's fees clause in the Amended Declaration, which constitutes "a binding equitable servitude[,] is a 'contract' within the meaning of Civil Code section 1717." (*Mackinder v. OSCA Development Co.* (1984) 151 Cal.App.3d 728, 738 (*Mackinder*); *Huntington Landmark Adult Community Assn. v. Ross* (1989) 213 Cal.App.3d 1012, 1023–1024 [attorney's fees provision in CC&R's enforceable under Civil Code § 1717].)

The Robinsons "are bound by all provisions of the [Amended] Declaration . . . including the provision for attorney fees, without regard to whether the [Amended] Declaration . . . constitutes a technical 'contract.'" (*Mackinder, supra*, 151 Cal.App.3d at p. 738.) The *Mackinder* court concluded, "[r]egardless of the form of the instrument, whether by contract,

34

deed, or binding equitable servitude, an instrument containing a provision for the recovery of attorney fees in the event of litigation is governed by the reciprocity provisions of Civil Code section 1717." (*Mackinder*, at 739.)  It is irrelevant that the community subject to the Amended Declaration is not a common interest development subject to the Davis-Stirling Act.  *Mackinder*, decided before the enactment of the Davis-Stirling Act, explained that after the recording of language imposing restrictions on each parcel in a subdivided tract, "mutual servitudes spring into existence as between the first parcel conveyed and the balance of the parcels at the time of the first conveyance." (*Mackinder*, at p. 735.)  Accordingly, the Amended Declaration is an equitable servitude that is enforceable as a contract containing an attorney's fees clause.  Based on this conclusion, we need not address the parties' remaining arguments.

## VI.  Financial Elder Abuse Claims

### A.  *Additional Background*

The Robinsons' third amended cross-complaint (the cross-complaint) alleged two causes of action for financial elder abuse (Welf. & Inst. Code, § 15610.30) based on the Letter (*ante*, fn. 3).  The Robinsons alleged that 49-year-old Anne used 89-year-old Rex's affection for her to unduly influence him.  Over a period of five days, Anne prepared at least six drafts of the letter that she presented to Rex during his hospitalization for, among other things, heart disease and depression.  Rex then allegedly signed the Letter, written as a communication from Rex to Randy, asking Randy to complete the lot-line adjustment and easement described in the Letter if Rex was unable to do so.

Randy alleged the sixth cause of action for financial elder abuse against Anne in his capacity as Rex's personal representative.  He alleged that the Letter (1) purported to transfer real property rights, (2) constituted an

unlawful taking of Rex's property by means of undue influence and an intent to defraud, and that (3) Anne intended the Letter to be a legally enforceable contract. Randy alleged the seventh cause of action for financial elder abuse against Anne and Nicholas. Randy claims that after Rex signed the Letter it became his personal property, and the DeBevoises hid the Letter from him with the intent to defraud him of his property rights and deprive him of his inheritance. The trial court sustained the DeBevoises' demurrer to the financial elder abuse causes of action without leave to amend on the grounds that the Letter was not an enforceable contract, it transferred no property rights to Anne, it did not cloud the Robinsons' title to their real property,[13] and required no disclosure.

## B.  *Legal Principles*

The elements of a cause of action for financial elder abuse are set forth in Welfare and Institutions Code section 15610.30, subdivision (a), which provides in part:  " 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following:  [¶] (1) Takes, secretes, appropriates, or retains real or personal property of an elder . . . to a wrongful use or with intent to defraud, or both[;] [and] [¶] (2) Assists in taking, secreting, appropriating, or retaining real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both."  "For purposes of this section, a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult *is deprived of any property right*, including *by means of an agreement, donative transfer, or testamentary bequest*, regardless of whether the property is held directly or

---

[13]    In this section, we refer to the Robinsons' real property as "the property."

by a representative of an elder or dependent adult." (*Id.*, subd. (c), italics added.)

On appeal from a judgment based on an order sustaining a demurrer, we assume all the facts alleged in the complaint are true. (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 528.) We accept all properly pleaded material facts but not contentions, deductions, or conclusions of fact or law. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 (*Evans*).) We independently review the superior court's ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action. (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768.) "In considering a trial court's order sustaining a demurrer without leave to amend, ' "we review the trial court's result for error, and not its legal reasoning." ' " (*Morales v. 22nd Dist. Agricultural Assn.* (2018) 25 Cal.App.5th 85, 93 (*Morales*).)

**C.** *Analysis*

The Robinsons contend the trial court erred in sustaining the demurrer to their financial elder abuse claims because the Letter impaired and devalued Rex's real property rights. Specifically, Rex's estate plan intended to leave the property free and clear of all encumbrances to Randy, but the DeBevoises interfered with Rex's right to dispose of his property upon his death free and clear of all encumbrances. Relying on *Bounds v. Superior Court* (2014) 229 Cal.App.4th 468 (*Bounds*), the Robinsons contend that " 'property rights' " include the right " 'to dispose of [one's] property by sale or by gift,' " and a wrongful deprivation of that right constitutes actionable elder abuse, even if the defendant does not acquire the property. (*Id.* at p. 479, italics omitted.)

37

The Robinsons' reliance on *Bounds*, *supra*, 229 Cal.App.4th 468 is misplaced. In *Bounds*, the elder, who had diminished capacity, possessed real property and was the trustee of the living trust that owned the real property. (*Id.* at pp. 472, 473.) Real parties in interest (the buyers) convinced the elder to sign a lease agreement which reflected a higher implied value of the property than the purchase price in the escrow instructions, and a letter of intent to sell real property at a price that they knew was far below market value. (*Id.* at pp. 472, 474.) The buyers had the elder execute two sets of escrow instructions. The first set of instructions directed the sale of the real property and the second set directed the sale of the manufacturing equipment on the property. (*Id.* at p. 474.) Relying on the escrow instructions signed by the elder, the buyers sued to enforce the sale contracts to sell the real property and equipment. (*Id.* at p. 475.)

A cross-complaint was filed on the elder's behalf alleging that the trust's ability to sell the property and the elder's ability to borrow against the property had been substantially impaired immediately upon her executing the escrow instructions and lease with the buyers. (*Bounds*, *supra*, 229 Cal.App.4th at pp. 475–476.) The trial court, however, sustained a demurrer to the cross-complaint without leave to amend because title to the property never transferred. (*Id.* at pp. 472, 476.) On appeal, the primary issue was whether executing the escrow instructions constituted a "taking" under Welfare and Institutions Code section 15610.30 when title to the real property remained in the trust. (*Bounds,* at p. 479.) The Court of Appeal concluded that the letter of intent and escrow instructions "which set forth the parties' understanding about their respective rights and duties in regard to the sale of the real property, clearly constitute agreements within the meaning of [Welfare and Institutions Code] section 15610.30, subdivision (c)."

(*Bounds,* at p. 479.) It held that the escrow instructions constituted a taking based on the allegation that petitioners' ability to sell or encumber the real property on the best possible financial terms had been taken by the escrow instructions and vacated the order sustaining the demurrer. (*Id.* at pp. 480, 483, 474–485.)

Here, the Robinsons' attempt to bring this matter under *Bounds*, *supra*, 229 Cal.App.4th 468, by alleging that the Letter interfered with Rex's right to use the property because it purported to grant an easement to the DeBevoises, imposed upon Rex and his successors a duty to disclose the agreement to buyers of the property, to which disclosure would impair Rex's ability to sell the property for its then market value or to use the property as security to obtain a loan on reasonable and commercially acceptable terms. However, unlike the executed escrow instructions in *Bounds* that the buyers sued to enforce, the Letter did not impair Rex's or the Robinsons' rights to the property, nor did it constitute an agreement within the meaning of Welfare and Institutions Code section 15610.30, subdivision (c).

On its face, the Letter merely evidenced Rex's intent to grant a lot-line adjustment and easement in favor of Anne, and his desire that Randy "complete" the lot-line adjustment and easement. The Robinsons alleged in their cross-complaint that Rex's family members and his estate planning lawyer did not know about the Letter and Randy did not learn if its existence until May 4, 2016, 24 days before the DeBevoises commenced this action. Rex died in 2000 and the Robinsons do not explain how the Letter impaired Rex's property rights before his death because the Letter imparted no rights to Anne and no one, other than the DeBevoises and Rex, knew about the Letter.

Critically, unlike *Bounds*, *supra*, 229 Cal.App.4th 468, the DeBevoises' original complaint, first amended complaint and operative second amended complaint, while acknowledging the existence of the Letter, pursued no claims under the Letter. Moreover, the Letter did not actually give, or even promise to give, the DeBevoises any property interest in exchange for something from Anne. Rather, Rex expressed his intent to grant Anne a lot-line adjustment and easement and requested that Randy "complete the . . . lot-line adjustment and easement, described" in the Letter, which he intended as a gift to Anne. The parties, however, never completed the lot-line adjustment. (See *Foltz v. First Trust & Savings Bank* (1948) 86 Cal.App.2d 59, 62 [promise in letter to make gift creates no obligation in favor of promisee].) Nor have the Robinsons explained how the Letter, which they claim no one but the DeBevoises and Rex knew about, impaired the value of the property. The Robinsons' allegation that the Letter "cloud[ed]" title to the property is a legal conclusion entitled to no weight.[14] (*Evans*, *supra*, 38 Cal.4th at p. 6.) They provide no support for the assertion that a letter from a property owner to the property owner's son, that the property owner disclosed to no one, expressing the property owner's future wishes regarding the real property, placed a cloud on title to that property.[15]

---

[14] The term "cloud on title" is defined as "[a]n outstanding claim or incumbrance which, if valid, would affect or Impair the title of the owner of a particular estate, and which apparently and on its face has that effect." (The Law Dictionary, Featuring Black's Law Dictionary (2d ed.) <https://thelawdictionary.org/?s=cloud+on+title> [as of Dec. 29, 2022], archived at <https://permacc/C9SF-CDKH>.)

[15] The Robinsons' reliance on *Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, to support their financial elder abuse claims is similarly misplaced. *Mahan* involved life insurance policies purchased by elder plaintiffs that named their children as beneficiaries. (*Id*. at p. 846.)

Finally, the Robinsons do not explain how the trial court erred in sustaining the demurrer to their seventh cause of action alleging that the DeBevoises' concealment of the Letter from Randy constituted financial elder abuse against Randy by depriving him of his personal property—i.e., the Letter. As a result, the Robinsons have forfeited any claim of error regarding the seventh cause of action for financial elder abuse. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [failure to develop claim with reasoned legal argument and supporting authority forfeits the issue]; *Denham, supra,* 2 Cal.3d at p. 564 [judgment is presumed correct, and appellant has burden to affirmatively demonstrate error].)

Accordingly, we conclude that the trial court properly sustained the demurrer to the financial elder abuse causes of action without leave to amend.[16]

---

The policies were held in a trust, created as part of their estate plan, of which their daughter was the trustee and beneficiary. (*Id.* at p. 846.) Respondents, the elder plaintiffs' life insurance advisors, allegedly carried out an elaborate scheme that involved arranging the surrender of one of the life insurance policies and the replacement of the other with a policy providing more limited coverage, at massively increased costs, and generating $100,000 in commissions to the respondents. (*Ibid.*) The appellate court rejected respondents' argument that "an 'estate plan' cannot be a property right," stating that respondents' misconduct made voluntary transfer of the elder plaintiffs' chosen gift assets " 'in their estate plan much more expensive and of lesser value, [their] right to dispose of their property has been damaged.' " (*Id.* at p. 862.) The facts here are not similar to the facts in *Mahan.*

[16] The Robinsons also contend that the trial court improperly based its demurrer ruling on the allegations in the DeBevoises' complaint and a purported concession by the DeBevoises that they were not pursuing any claims based on the Letter. We need not address these claims because we affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons. (*Morales, supra,* 25 Cal.App.5th at p. 93.)

## DISPOSITION

The judgment and orders are affirmed.  The DeBevoises are awarded their costs on appeal.

DATO, Acting P. J.

WE CONCUR:

DO, J.

BUCHANAN, J.